UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE APPLICATION FOR ARREST WARRANT | Case No. 3:26MJ630 (SDV)<br><br>**Filed Under Seal** |

MAY 29 2026 PM2:37
FILED-USDC-CT-NEW HAVEN

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT, ARREST WARRANT, AND SEIZURE WARRANTS**

I, Ryan Oates, being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since 2016. I am currently assigned to the New Haven Field Office, I have participated in investigations involving individuals suspected of interstate transportation of stolen property and other federal offenses. I have written, obtained, and/or coordinated the execution of search and arrest warrants pertaining to individuals involved in various federal offenses. I have received training in a variety of areas relevant to my position as a Special Agent while at the FBI Academy in Quantico, Virginia.

2. I make this affidavit in support of a criminal complaint against, and arrest warrant for, Nursulton Izzatulloevich Khaydarov, aka Sayid Makhmudarov, aka Rustam Mavlonov, aka Dmitri Aganin ("**Individual 1**") (year of birth: 1993) for violations of Title 18, United States Code, Sections 371 (conspiracy), 1343 (wire fraud), and 1957 (monetary transactions) (the "Target Offenses"). I also submit this affidavit in support of two seizure warrants.

3. **Individual 1** is a Lawful Permanent Resident of the United States who appears to be residing in or near Burbank, California. He is not currently known to have a permanent address but, in connection with the commission of the Target Offenses, has traveled extensively throughout the United States using multiple aliases and false identification documents.

4. The facts in this affidavit come from the evidence gathered thus far in the ongoing investigation, my personal observations, my training and experience, and information obtained from other law enforcement officers, agents, and witnesses. This affidavit is intended to show merely that there is probable cause for the requested arrest warrant and seizure warrants and does not set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. PROBABLE CAUSE

### A. Overview of the Conspiracy

5. Beginning no later than September 2025 and continuing through the present, **Individual 1** and his co-conspirators have been committing numerous cargo thefts from interstate shipment from locations in California and elsewhere, several of which are described herein. The co-conspirators appear to be deploying sophisticated techniques of deception and concealment to commit the Target Offenses, including the use of false identification documents and aliases, the frequent dropping of telephone numbers, unauthorized use of the identities and email accounts of legitimate business owners, and potential tampering or spoofing of GPS location trackers.

6. Based upon the evidence collected so far in this investigation, I believe that, in general, the co-conspirators purchase or otherwise assume control of the U.S. Department of Transportation ("USDOT") and motor carrier identification numbers,[1] as well as the identities and email accounts of legitimate motor carrier companies. Co-conspirators then use the business email account to assume the identity of the previous owner and continue operating the business as if no change of ownership occurred. The use of the legitimate business owner's identity (including name, email signature block, and other personal identifying information) appears to be done without their knowledge or consent in order to facilitate the fraud, allowing the co-

---

[1] A USDOT number is unique identifier required to operate commercial vehicles transporting passengers or hauling cargo in interstate commerce. In addition to the USDOT number, certain companies are also required to have interstate operating authority, often identified as an "MC," "FF," or "MX" number, depending on the type of authority that is granted.

conspirators to pose as the previous business owner and exploit the reputation and trust of an established business to obtain contracts for interstate shipments through email and other electronic means.

7. Once the co-conspirators – using the fraudulently obtained email account – negotiate a contract for an interstate shipment with a freight broker, they dispatch one of a number of drivers, one of whom I believe to be **Individual 1**. The driver then picks up the shipment from the distribution location, though the load does not make it to its intended destination and is reported stolen. At times, using the compromised business email, the co-conspirators demand ransom payment from the freight broker for the return of the stolen load. Payment is demanded by cryptocurrency or other electronic funds transfer. Other times, using the compromised business email, the co-conspirators offer initial excuses for a delay, then simply do not engage further with the victim broker. I believe this is intended to allow maximum time for the driver to offload the stolen shipment at a safe location before the victims realize they have been defrauded and notify law enforcement.

8. The reported total loss from these thefts — which involved shipments of hard drives, stereo equipment, clothing, electronics, computer equipment, food items, nicotine products, and other goods — is currently more than $8.5 million based on the stolen shipments' estimated retail value. Based on the evidence gathered thus far in the investigation, my experience investigating similar cases, my conversations with other law enforcement officers and victims, the interstate nature of these thefts, I believe that following many of the thefts, the suspects then likely transported the stolen property across state lines.

9. According to USDOT, cargo theft costs the U.S. economy billions annually. In recent years, organized cargo thefts have grown in frequency and sophistication. For example, according to the American Trucking Associations, a national trade association for the trucking industry, perpetrators are increasingly using deception — as opposed to physical force, such as burglary and hijacking — to commit such crimes. In such so-called strategic thefts, the perpetrators utilize techniques — often cyber-enabled — to deceive shippers, brokers, and

carriers into handing cargo loads over to thieves instead of the legitimate receiver. According to CargoNet,[2] cargo theft losses in 2025 were estimated to be nearly $725 million, a 60 percent increase from 2024, in part because organized criminal groups have increasingly focused on high-value shipments. The average value per theft was approximately $274,000 in 2025.

**B. Association of Individual 1's iPhone with Several Cargo Thefts**

10. Based on information collected in this investigation, including cell-site location information for a device I believe was used by **Individual 1** ("**Individual 1**'s iPhone" or the "iPhone"), comparison of known photographs of **Individual 1** to counterfeit driver's licenses he used to pick up shipments, security surveillance video and images, the contents of emails of two compromised business email accounts, and the contents of two personal email accounts used by **Individual 1**, I believe **Individual 1** was involved in more than 12 thefts from interstate shipment in this conspiracy since September 2025, with the estimated loss amount attributable to him alone being greater than $8.5 million. Initially, it appeared that **Individual 1** used his true identity when obtaining two stolen shipments in or about September and October 2025, the first of which is discussed further below. However, since in or about December 2025, **Individual 1** has used at least three, and possibly more, aliases and counterfeit driver's licenses, though he continues to hold a valid Class A Commercial Driver's License ("CDL") out of New Jersey.

11. Further, I believe **Individual 1** used his iPhone, which is a red Apple iPhone 11, based on subscriber records, call detail records, and other information obtained during the investigation. These records showed that **Individual 1** had regularly changed the telephone numbers for the iPhone beginning in or about September 2025, when I believe **Individual 1** became involved in the conspiracy. In September 2025, **Individual 1** was involved in a theft from interstate shipment (noted in Table 1, below, as Theft 1). The complainant reported that **Individual 1**, who used his true identity, picked up the shipment but never delivered it. The

---

[2] CargoNet is an online portal that facilitates secure information sharing among theft victims, their business partners, and law enforcement, with the stated goals of assisting in cargo theft prevention and recovery. Victims can report incidents of cargo theft to CargoNet via this online portal.

complainant also reported that **Individual 1** used telephone ending in 5349 (the "5349 Number"), which is a phone number associated with **Individual 1**'s iPhone.

12. According to public records, the 5349 Number had been attributed to **Individual 1** since in or about April 2015. According to the Department of Homeland Security ("DHS"), **Individual 1** provided the 5349 Number to DHS as his contact information in 2022 in an immigration-related matter. Records provided by Verizon showed that the 5349 Number was subscribed in **Individual 1**'s name and to the address on **Individual 1**'s New Jersey license. The 5349 Number, however, ceased to be used on or about September 16, 2025. Verizon records further showed that the device using the 5349 Number was assigned International Mobile Equipment Identity ("IMEI") ending in 97162 ("IMEI -97162"), one of two IMEIs assigned to **Individual 1**'s iPhone.

13. Records obtained from Apple showed that the 5349 Number and the device associated with IMEI -97162 (i.e., **Individual 1**'s iPhone) were registered to an Apple iCloud account ("**Individual 1**'s Apple Account"). **Individual 1**'s Apple Account was registered in the name "Nurik Khaydarov," which I believe to be a nickname for **Individual 1** based on Slavic naming conventions and similarity to **Individual 1**'s first name, in or about March 2020. The billing and payment information was in **Individual 1**'s name, "Nursulton Khaydarov," as recently as on or about February 28, 2026. Apple records further identified the device assigned IMEI -97162 as a red Apple iPhone 11, i.e., the same type of device as **Individual 1**'s iPhone. Apple records further revealed that this iPhone 11 was also assigned a secondary IMEI, i.e., an IMEI ending in 26690 ("IMEI -26690").[3]

14. I therefore believe that **Individual 1** was the user of the 5349 Number and the iPhone.

---

[3] According to information from Apple's website (support.apple.com), last viewed March 31, 2026, an iPhone 11 can use Dual SIM technology. This allows a single capable device, such as **Individual 1**'s iPhone, to use one physical SIM card and one eSIM (i.e., a digital SIM) simultaneously. This functionality gives a user the ability to utilize separate voice and data plans, separate telephone numbers, and separate service carriers on the same device at the same time, and further explains why I believe that the **Individual 1**'s iPhone has two IMEIs. I therefore believe that both IMEI -97162 and IMEI -26690 belong to the same iPhone 11 device, i.e., **Individual 1**'s iPhone.

15. On or about April 7, 2026, the FBI obtained a federal search warrant authorizing the collection of cell site location information and precision location information for **Individual 1**'s iPhone. Verizon identified a new number ending in 6461 (the "6461 Number"), as attributed to IMEI -97162. T-Mobile identified a new telephone number ending in 9081 (the "9081 Number"), as attributed to IMEI -26690. Based on my training and experience, I know that an IMEI is a number unique to a particular device, such as smartphones, tablets, and other mobile devices. IMEIs are used by carriers to identify a device on a mobile network. Each IMEI is unique to a particular device and cannot be changed easily, even if someone swaps out the SIM card. Therefore, a particular device should always have the same IMEI(s), but may change telephone numbers, as **Individual 1** appears to have done here. Analysis of the location information for both the 6461 and 9081 Numbers showed them being in or near the same place at approximately the same time, confirming that the 6461 and 9081 Numbers were used by a single device, **Individual 1**'s iPhone. Verizon subscriber records showed the 6461 Number was activated on or about March 15, 2026 and subscribed to in the name "Nursulton Khay," which is the first name and partial last name of **Individual 1**. There was no subscriber information for the 9081 Number, though it was activated on the same date, March 15, 2026.

16. On or about April 9, 2026, location information from **Individual 1**'s iPhone indicated that it was in the immediate vicinity of a truck stop in or near North Las Vegas, Nevada. FBI surveillance located a white 2017 Volvo tractor attached to a 53' trailer (the "Suspect Trailer") parked at the location where **Individual 1**'s iPhone was reportedly located. The Suspect Vehicle bore New Jersey registration AT903S, which was used in multiple thefts as described herein. As discussed further below, the FBI later determined that the tractor was a 2017 Volvo tractor with a New Jersey registration AW494L and VIN 4V4NC9EH4HN954902 ("Suspect Vehicle").

17. The Suspect Vehicle also had a placard on its side displaying the name of a motor carrier name and an MC and USDOT number corresponding to that motor carrier company . This motor carrier company had been reported multiple times between March and April 2026 as

having picked up interstate shipments that were then reported stolen, some of which I believe **Individual 1** was involved in. One of these theft reports identified the driver by counterfeit Nevada license as "Dmitri Aganin" with an altered image of **Individual 1** on the license.

18. The driver picked up a load from a location in or near Tucson, Arizona on or about April 22, 2026, that was later reported stolen. Location information showed that **Individual 1**'s iPhone was in or near that particular location in Tucson, Arizona on the date of the pickup. I therefore believe that **Individual 1** continued to use the iPhone from in or about September 2025 through at least April 2026, and that **Individual 1** was the driver of the Suspect Vehicle, which had the Suspect Trailer attached to it[4] when observed on or about April 9, 2026 displaying a placard of a compromised motor carrier company.

19. The table below summarizes some, but not all, of the thefts I believe **Individual 1** committed as part of this conspiracy:

| | Location of Theft | Date of Theft | Identity Used by Individual 1 |
|---|---|---|---|
| Theft 1 | Swedesboro, New Jersey | 9/13/2025 | Nursulton Khaydarov (true name) |
| Theft 2 | Terra Bella, California | 12/19/2025 | Sayid Makhmudarov |
| Theft 3 | Compton, California | 1/9/2026 | Rustam Mavlonov |
| Theft 4 | Fullerton, California | 2/20/2026 | Rustam Mavlonov |
| Theft 5 | Laredo, Texas | 4/3/2026 | Dmitri Aganin |
| Theft 6 | San Diego, California | 4/28/2026 to 4/29/2026 | Possibly Nurtas Kairat |

*Table 1*

## C. Theft 1

20. Regarding Theft 1, a complaint made to law enforcement identified **Individual 1** as the driver assigned to pick up an interstate shipment on or about September 13, 2025. **Individual 1** reportedly picked up the shipment in or near Swedesboro, New Jersey, but the shipment never made it to its intended destination in Texas. **Individual 1** picked up the shipment

[4] I believe the Suspect Trailer attached to the Suspect Vehicle on or about April 9, 2026 was the same trailer attached to the Suspect Vehicle when **Individual 1** was encountered by the Ontario PD on or about May 18, 2026 based on a comparison of multiple specific and unique markings on the trailer in each instance, as described and shown in paragraph 42 below.

under the motor carrier Artan Transportation LLC ("MC-1"). A search of one of two personal email accounts used by **Individual 1** showed that he emailed a Bill of Lading corresponding to this shipment to a cloud printing service.

21. Records for **Individual 1**'s iPhone (using the 5349 Number) showed that it received a call from the Swedesboro victim company on or about September 14, 2025, at approximately 12:23 a.m. At the time of that call, **Individual 1**'s iPhone used a cell tower covering the immediate area of the location from which the cargo was stolen. The complainant reported to police that the stolen load had been picked up on or about September 14, 2025, at approximately 1:15 a.m., near in time to when **Individual 1** was at or near the theft location. I therefore believe **Individual 1** had the iPhone with him when he picked up the shipment that was later reported stolen.

**D. Theft 2**

22. Regarding Theft 2, on or about December 19, 2025, a shipment of pistachios intended to be shipped from Terra Bella, California to Laredo, Texas was reportedly stolen by a driver ostensibly operating under a motor carrier company ("MC-2"). According to the complainant, the shipment was never received at its intended destination. The stolen property has not been recovered. Information provided by the complainant indicated that the driver provided an Illinois driver's license in the name Sayid Makhmudarov ("Makhmudarov"). Searches of Illinois Department of Motor Vehicles (DMV) registration records revealed that no such license existed under the provided driver's license number, and that no license had been issued to Makhmudarov. I therefore believe that the driver's license was counterfeit.

23. A photocopy of Makhmudarov's driver's license was taken in the course of business during the pickup from Terra Bella, California and appears to show **Individual 1**'s likeness on it. The truck's registration was also noted as New Jersey license plate AT9035, which I believe to actually have been AT903S.

24. In fact, a license plate reader image from on or about December 5, 2025, in Arizona, depicted the license plate AT903S on what appeared to be the Suspect Vehicle:







**E. Theft 3**

25. Regarding Theft 3, on or about January 9, 2026, a shipment of electronics intended to be shipped from Compton, California to El Paso, Texas was reportedly stolen by a driver ostensibly operating under another motor carrier company ("MC-3"). According to the complaint, the shipment was never received at its intended destination. The stolen property has

not been recovered. The complainant provided records, video, and photographs in support of the complaint. This information showed that a driver picked up the shipment from the Compton location on or about January 9, 2026. The driver identified himself as Rustam Mavlonov ("Mavlonov") with a counterfeit Illinois driver's license in that name with an altered picture of **Individual 1**'s likeness. The victim broker received a photograph from MC-3 of the license plate, New Jersey registration AT903S, for the truck that MC-3 was dispatching to pick up the shipment. Security video shows what appears to be the Suspect Vehicle at the pick-up location on the date and in the timeframe of the theft when **Individual 1** was present at the facility obtaining the load.

26. On or about January 19, 2026, in an attempt to obtain an interstate shipment, co-conspirators used the email account for MC-3 (the "MC-3 Email Account") to send, among other documents, a W-9 Request for Taxpayer Identification Number and Certification form in the name of the owner of MC-3 and the business name of MC-3 dated February 9, 2025 to a broker company located in the District of Connecticut. The form contained what was portrayed as the signature of MC-3's owner, though MC-3's owner no longer had any interest in the company by January 19, 2026. In the body of the email, co-conspirators identified the W-9 as their own, though the sender identified himself as "Robert" and not in the name of MC-3's owner.

27. On or about March 13, 2026 and again on or about March 31, 2026, the MC-3 Email Account was accessed through IP addresses resolving to locations in the District of Connecticut.

### F. Theft 4

28. Regarding Theft 4, on or about February 20, 2026, a shipment of nicotine products intended to be shipped from Fullerton, California to Shepherdsville, Kentucky was stolen by an individual ostensibly operating under yet another motor carrier company ("MC-4"). According to the complainant, the shipment was never received at its intended destination. The stolen products were the entire stock for a product launch to the marketplace. The stolen products consisted of two new flavors of nicotine pouches that were not publicly available at the time of

the theft. Additionally, the products in the shipment were intended for direct-to-consumer sales by the brand company, rather than any business-to-business transactions. At the time, no entity other than the owning brand company should have had this stock in their possession. In other words, any person or entity in possession of these two particular flavors of the product at that time would have been in possession of stolen property.[5] A portion of the stolen freight was recovered at a warehouse in California in April 2026 (along with other freight believed to have been stolen by **Individual 1**), but a significant remainder has not been recovered. The complainant reported that the driver picked up the shipment from the Fullerton location on or about February 20, 2026. No license plate information was available. However, the driver provided the same counterfeit Illinois driver's license in the name Mavlonov described above. As discussed below, some of this freight is believed to have been stored at a warehouse in West Haven, Connecticut shortly after the theft.

29. In the days immediately following the theft, the brand company was contacted by one of their clients, who had learned from a local customer that a wholesale warehouse located in West Haven, Connecticut offered the stolen flavors for sale. The brand company conducted research into the wholesaler and learned that the wholesaler also had locations in Pennsylvania and New Jersey.

30. After learning this information, the company hired private investigators to attempt to determine whether the wholesaler in Connecticut still had the product in their possession. On or about February 27, 2026, the private investigators portrayed themselves as potential customers/distributors to the Connecticut wholesaler. The investigators were shown around the warehouse by an employee of the warehouse. The investigators saw other products of the same brand as those stolen nicotine products but did not see the stolen flavors themselves.

31. In early March 2026, at the direction of the FBI, another source of information learned through a third party that the owner of the wholesale warehouse in Connecticut had the stolen products available for sale. Based on the publicity caused by the theft, as well as what I

---

[5] As of in or about April 2026, the flavors were made available for public purchase.

have learned through the investigation, I believe that the warehouse owner would likely sell the stolen products only to trusted customers.

**G. Theft 5**

32. Regarding Theft 5, on or about April 3, 2026, a shipment of disk drives intended to be shipped from Laredo, Texas to Milpitas, California was stolen by an individual ostensibly operating under the name of another motor carrier company ("MC-5"). According to the complainant, the shipment was never received at its intended destination. The complainant reported that the driver picked up the shipment from the Laredo location on or about April 3, 2026. The driver provided a counterfeit Nevada driver's license in the name "Dmitri Aganin" to pick up this load. The Aganin identification again had an altered version of **Individual 1**'s likeness on it. Based on a comparison of the Aganin driver's license to **Individual 1**'s known photograph and counterfeit licenses described above, I believe **Individual 1** also used the alias Dmitri Aganin in relation to these thefts.

**H. Theft 6**

33. Regarding Theft 6, a theft was reported to have occurred in or near a location in San Diego, California on or about April 28, 2026. A shipment destined for El Paso, Texas was picked up by a driver ostensibly working for a different motor carrier ("MC-6"). A driver, which may have been **Individual 1**, provided a counterfeit Ohio driver's license in the name Nurtas Kairat. After pickup, communication with MC-6 reportedly became spotty. On or about April 29, 2026, MC-6 first advised the truck was in Arizona, but later said it was in San Diego, California and that the driver wanted to return the load to the shipper. The driver reportedly did return to the shipper, however the driver left before being unloaded and had since ceased communication. The shipment was considered stolen and has not been recovered.

34. The profile photo on the identification for Kairat was not that of **Individual 1**. However, location information for **Individual 1**'s iPhone showed that it was present at or near the San Diego theft location on both April 28 and April 29, 2026 before traveling north through California. The investigation has revealed that **Individual 1** emailed a Bill of Lading

corresponding to this shipment to a cloud printing service. The tractor that appears to be the Suspect Vehicle was also captured on surveillance video along with an individual who appears to be **Individual 1**.

## I. Additional Evidence Linking Individual 1 and the Suspect Vehicle to Cargo Thefts

35. **Individual 1**'s iPhone was also at or near other theft locations described above (Thefts 1, 4, and 5)[6] at or near the times of the thefts, as well as other thefts in this conspiracy not described in this affidavit. I therefore believe that **Individual 1** was involved in these thefts and had the iPhone with him during the relevant times.

36. Reporting, surveillance footage, and/or other evidence showed what appeared to be the Suspect Vehicle (bearing New Jersey registration AT903S when such information was reported) pick up the shipments described above in Thefts 2, 3, 4, and 5, as well as other thefts involving **Individual 1** in this conspiracy.

37. For comparison, the following images of the Suspect Vehicle were obtained from surveillance footage from the thefts described above:

[6] **Individual 1**'s iPhone frequently changed telephone numbers between September 2025 and May 2026. Not all telephone numbers prior to February 2026 have yet been identified, including the time periods covering Thefts 2 and 3.



(Theft 2)



(Theft 4)



(Theft 5)

38. For comparison, the following images were from the counterfeit identifications used to facilitate the thefts described above (from left: Theft 2, Thefts 3 and 4, Theft 5):







39. New Jersey DMV records show that **Individual 1** holds a Class A Commercial Driver's License, allowing him to operate the type of truck and trailer as the Suspect Vehicle.

**Individual 1** provided this license as identification to police on or about May 18, 2026, when encountered by Ontario PD. A photo of **Individual 1** from the DMV record is shown below for comparison:



40. The following are surveillance images of **Individual 1** at the thefts described above (from left: Theft 3, Theft 4, Theft 5):



41. **Individual 1** was also involved in an additional (seventh) theft from City of Industry, California on or about March 18, 2026, wherein he used the counterfeit Nevada identification in the name Dmitri Aganin (as in Theft 5) to obtain a shipment that was later

reported stolen. Below is a photograph taken of **Individual 1** at the time he picked up the shipment in the March 18 theft, wearing the same, if not similar hat, as seen in Thefts 3 and 4:



42. A photo of the Suspect Trailer was also taken at the March 18 theft. Multiple specific and unique markings on the trailer **Individual 1** used to pick up the shipment in City of Industry appear to match those on the Suspect Trailer: specifically, areas of damage on the lower front of the driver's side of the trailer, a sticker, and tape and glue residue from what may have been stickers previously affixed on the driver's side area:




*Image of the Suspect Trailer from April 9, 2026 in Nevada (left) and May 18, 2026 encounter with Ontario PD (right)*

These same identifying markings were observed on the trailer attached to the Suspect Vehicle during FBI surveillance on or about April 9, 2026, as described in footnote 4 above.

**J. Ontario PD's May 18, 2026 Encounter with Individual 1 and the Suspect Vehicle and the May 28, 2026 Search of the Suspect Vehicle**

43. According to information recently provided to me by Ontario PD, on or about May 18, 2026, Ontario PD were notified that a particular license plate was present in Ontario, California. That license plate had been flagged in law enforcement systems as having been associated with suspected cargo thefts. Ontario PD located the trailer with the license plate of interest, i.e., the Suspect Trailer, which appeared to be counterfeit, near a gas station and conducted a traffic stop. **Individual 1**, who identified himself by the New Jersey license in his true name as mentioned above, was the driver of the Suspect Vehicle, which had the Suspect Trailer attached (onto which was affixed the flagged license plate). Ontario PD conducted a field interview with **Individual 1**, who consented to speaking with the officer. **Individual 1** said that

the Suspect Vehicle was his, had been his for the last three years, and that no one else drove the Suspect Vehicle during that time.

44. **Individual 1** also consented to a search of the Suspect Vehicle. Within the Suspect Vehicle, the officer saw what appeared to be a counterfeit Pennsylvania driver's license and a nicotine canister containing one of the specific flavors stolen from Theft 4 described above. **Individual 1** told the officer that his boss gave him the counterfeit driver's license earlier that day and instructed **Individual 1** to keep the license in the Suspect Vehicle. **Individual 1** did not admit to any wrongdoing. **Individual 1** told the officers that he essentially lived out of the Suspect Vehicle, though at times he stayed with a friend in a neighboring area.

45. Ontario PD impounded the Suspect Vehicle and Suspect Trailer.

46. On May 28, 2026, the FBI executed a federal search warrant on the Suspect Vehicle, which bore a New Jersey license plate AW494L. Individual 1 was not present. The Suspect Vehicle was registered to Fast Way UZB Trans Inc, a company which New York Department of State business records show **Individual 1** as the registered agent. Multiple specific and unique markings on the Suspect Vehicle appear to match those seen on the vehicle used in the thefts described above: particularly, paint damage to the driver's side mirror apparatus, as well as location and arrangement of stickers on the driver's side front quarter panel and driver's side rear panel. As discussed above, multiple specific and unique markings on the Suspect Trailer (as observed in body-worn camera footage from Ontario PD, which I have reviewed) appear to match those seen on the trailer used in the theft from City of Industry on or about March 18, 2026, and the trailer observed during FBI surveillance on or about April 9, 2026.

47. I therefore believe **Individual 1** generally used one plate (New Jersey plate AT903S) to commit the thefts at the pick-up locations, then swapped it out for the true license plate (New Jersey plate AW494L), which is properly registered to the Suspect Vehicle and is set to expire in or about July 2026 (suggesting that the plate has been registered to the Suspect Vehicle for a significant period of time prior to the May 18, 2026 police encounter).

48. Other evidence of **Individual 1**'s involvement in the Target Offenses were found in the Suspect Vehicle, including but not limited to: Bills of Lading corresponding to thefts in which **Individual 1** was a suspect; two nicotine cans, one of each flavor, believed to be from Theft 4; the gray hat with flag seen in the photos above from Thefts 3 and 4; and the orange hat seen in the photo above from Theft 5.

**K. Individual 1's Use of Cryptocurrency**

49. From November 29, 2025 through May 8, 2026, **Individual 1** received approximately $120,996 in cryptocurrency (via Coinbase) across approximately 33 transactions from another individual. The transactions ranged in amounts between $9 USD and $8,000 USD.

50. These transactions corresponded in time to the period when **Individual 1** was participating in the overall scheme described in this affidavit.

51. **Individual 1**'s Coinbase account was subscribed to in his true name on or about August 27, 2025. The subscriber's date of birth and New Jersey address corresponded to that seen on **Individual 1**'s New Jersey driver's license. To become a customer, **Individual 1** submitted to Coinbase a copy of his driver's license, which also corresponded to **Individual 1**'s New Jersey driver's license, as well as a picture of himself. Based on my participation in this investigation and review of **Individual 1**'s license and the images and video discussed herein, the picture of **Individual 1** submitted to Coinbase for the account is that of **Individual 1**. As of on or about May 8, 2026, the account contained approximately $35,002 USD. Coinbase records show **Individual 1**'s Coinbase user ID is 68af94130c0201f539bc7390 ("Coinbase Account").

52. On or about May 4, 2026, **Individual 1** sold cryptocurrency within the Coinbase account in the amount of approximately $13,063, then transferred those proceeds out. That same day, **Individual 1** withdrew approximately $3,346.99 to a JP Morgan Chase Bank account ending in -1020. Then on or about May 6, 2026, **Individual 1** withdrew $10,000 to a JP Morgan Chase Bank account ending in -1020.

53. Based on the investigation to date, **Individual 1** appears to have had no other source of material income since at least November 2025. The transactions described above

appear to be payment for **Individual 1's** involvement with the overall scheme described in this affidavit.

**L. Additional Information Regarding Forfeiture**

54. The government seeks a seizure warrant for Coinbase account held in the name of **Individual 1**, User ID 68af94130c0201f539bc7390.

55. For violations of 18 U.S.C. § 1343, the Coinbase Account is subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(C) for the forfeiture of property which constitutes or is derived from proceeds traceable to an offense constituting "specified unlawful activity" (as defined in 18 U.S.C. §§ 1956(c)(7) and 1961(1)), namely wire fraud in violation of 18 U.S.C. § 1343, or conspiracy to commit such offense, and criminal forfeiture under 18 U.S.C. 981(a)(1)(C) via 18 U.S.C. § 1956(c)(7)(A) (defining specified unlawful activities to include offenses listed in 18 U.S.C. § 1961(1)), 18 U.S.C. § 1961(1) (covering 18 U.S.C. § 1343), and 28 U.S.C. § 2461 (permitting criminal forfeiture if civil forfeiture is permitted) for violations of 18 U.S.C. § 1343.

56. For violations of 18 U.S.C. § 1957, the Coinbase Account is subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(A) and criminal forfeiture under 18 U.S.C. § 982(a)(1).

57. As set forth above, the Coinbase Account represents both proceeds of wire fraud and/or money laundering and is also involved in money laundering.

58. The government also seeks a seizure warrant of the Suspect Vehicle, described as a white 2017 Volvo tractor bearing New Jersey registration AW494L and VIN 4V4NC9EH4HN954902.

59. For violations of 18 U.S.C. § 1957, the Suspect Vehicle is subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(A) and criminal forfeiture under 18 U.S.C. § 982(a)(1).

60. As set forth above, the Suspect Vehicle was involved in the money laundering scheme. The Suspect Vehicle is an essential element of the overall scheme; without the Suspect Vehicle, the Target Offenses would not be able to be perpetrated.

61. The Suspect Vehicle is currently being held by the Ontario PD. As such, law enforcement is aware of its current location and there is no issue with law enforcement effectuating the seizure of the Suspect Vehicle because law enforcement in Connecticut is in communication with the Ontario PD. Because the Suspect Vehicle is already in the custody of another law enforcement organization, it is my understanding that the prosecutors assigned to this case are not submitting a separate search warrant seeking entry onto the property where the Suspect Vehicle is being held.

## III. CONCLUSION

62. Based on the information set forth above, there is probable cause to believe that **Individual 1** has committed violations of Title 18, United States Code, Sections 371 (conspiracy), 1343 (wire fraud), and 1957 (monetary transactions). Accordingly, I respectfully request that the Court issue an arrest warrant for the arrest of **Individual 1**.

63. I further request that the Court issue seizure warrants pursuant to pursuant to 18 U.S.C. § 981(b), 18 U.S.C. § 982(b)(1), and 21 U.S.C. § 853(f).

Respectfully submitted,

[signature]

Ryan Oates
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on May 29, 2026. at New Haven, CT.

[signature]

HON. S. DAVE VATTI
UNITED STATES MAGISTRATE JUDGE